## Case No. 14,830.

### UNITED STATES v. COLBY.

[1 Spr. 119;[1] 8 Law Rep. 496.]

District Court, D. Massachusetts. Nov., 1845.

SEAMEN — ASSAULT UPON BY MASTER — USE OF DEADLY WEAPON—WHEN JUSTIFIABLE.

1. The master of a ship, at sea, is justified in using a deadly weapon, to reduce a seaman to obedience, only in cases of necessity.

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr. Esq., and here reprinted by permission.]

2. The circumstances of each case must determine whether such necessity exists.

3. Among these are, the situation of the ship, and the manifestation of a friendly or hostile disposition, on the part of the crew.

4. If the circumstances are such as to induce a master of ordinary firmness and discretion, in the exercise of an honest judgment, to believe the danger to be imminent, and to require the use of a dangerous weapon, to reduce to obedience a seaman in open mutiny, with deadly weapons in his hand, and therewith threatening the lives of the officers, and the master should make use of a deadly weapon from good motives, he will be justified in so doing, although subsequent events make it appear that less severe and dangerous measures might have answered the purpose.

Indictment for an assault with a pistol, upon one Fuller, a seaman. The evidence was somewhat contradictory, but the main facts appeared to be as follows;—Upon a late voyage of the ship, under the command of the defendant, Fuller, a seaman, was engaged in mending a sail, under the direction of the captain, on the quarter deck, when Fuller made some reply to Captain Colby, which the latter deemed insolent, and thereupon reminded Fuller that he must give him no insolent answers. Fuller replied, "I give you no more insolence than you give me." The captain struck Fuller with his hand Fuller immediately seized his sheath knife, which lay by his side, and threatened to stab the captain; the latter thereupon called to his mate to secure the man. The first and second mate came to the assistance of the captain, and were met by Fuller, who made two dangerous passes at each with his knife, threatening to run them through, if they approached him. The defendant ordered his mate to knock Fuller down with a capstan bar, if he could not otherwise disarm him. Fuller thereupon retreated to the forward part of the ship, and seizing the cook's axe, placed himself underneath a boat, which was raised, upside down, and supported athwart ships, about seven feet from him, and swore he would cut down the first man that came near him. There was evidence tending to show that some of the crew were inclined to render assistance to Fuller. Fuller was repeatedly ordered by the captain and officers to put down his axe and knife, and go to his duty, but refused with an oath. The officers all testified that, from his appearance and manner, they were afraid to approach him, or attempt to disarm him; that, in their opinion, it would have been dangerous for any one so to do. The captain then went to the cabin, loaded his pistol with shot, came forward where Fuller was, and twice or three times ordered him to lay down his axe and go to his duty, or he, the captain, would fire upon him. This, each time, Fuller, with an oath, refused to do. The captain thereupon fired, and the shot took effect in the face and head of Fuller, by which he lost one eye, and the other, at the time of the trial, was much affected. It appeared, also, that the man at the wheel left his station, and that

the ship, during the affray, caught aback. The case was submitted to the jury without argument.

R. Rantoul, Jr., J. S. Dist. Atty.

G. T. Bigelow and M. S. Clarke, for defendant.

SPRAGUE, District Judge (charging jury). The law, gives to a captain of a ship, at sea, a power entirely unknown on land, out of the military service and places him in a situation, in respect to those under his control, quite different from that of a master towards his servant or apprentice, or that of an employer towards those employed by him. This authority is conferred for the preservation of the lives and property committed to his care, and is often as essential to the safety of the crew, as of the officers and ship. Hence the law has ever required of the seaman prompt and respectful obedience to all lawful orders of the captain. Even though the captain be in the wrong, or gives his orders in a harsh and insolent manner, or punishes without sufficient cause, still the seaman, while at sea, must submit to the wrong, and wait for redress till his return to port, rather than resort to violence, unless the wrong threatened to be done will work an irreparable injury. A seaman is not bound to submit to a permanent injury, for which no adequate redress can be given, such as the loss of a limb, an eye, or any enormous bodily harm, before resisting his superior officer; for the courts cannot afford complete redress for such wrongs. If the wrong threatened or done is such that it can wait for redress, the seaman is bound to wait, and will not be excused in forcible resistance to official authority For the use of this unusual power, the captain is amenable to the law; and for all abuse of it, whereby a seaman suffers, a remedy is provided upon his return to his country. In the case at bar, a dangerous weapon was used by the captain, whereby a lasting injury was done to a seaman. And the rule of law is, that no officer is authorized to use such a weapon, unless in case of necessity. This alone will be a justification. In the present case, the defence is distinctly placed on that ground. It is obvious, that the circumstances of each case must determine the question of necessity. The captain must not use a deadly weapon from anger, from pride of authority, or from passion, nor upon any occasion, when the circumstances are such that he can safely wait for the passion of the seaman to subside, and reason to resume its control, so that he may be able to induce, or compel, the mutinous person to return to his duty, by the use of milder means. It must be remembered, however, that the captain is to judge of his duty at once, with no time to wait and nicely weigh probabilities, and oftentimes with no time at all for deliberation or counsel. He cannot stop to inquire into suspicious circumstances, nor can he, at all times, be confident of the obedient dispositions of his men. The officers are generally the weaker party, and hence it becomes necessary for the captain to quell a mutinous disposition, before it has spread so far, as to be beyond his control. Hence the rule of law is, that if the captain, acting as a man of ordinary firmness, in the exercise of a sound discretion, and judging honestly from the circumstances, as they appeared to him at the time, did sincerely believe that the danger was imminent, and did require the use of a dangerous weapon to reduce to obedience a seaman actually in mutiny, and made use of such a weapon from honest motives, then he is justified in so doing, although subsequent events should make it appear, that less severe and dangerous measures might, perhaps, have accomplished the purpose. In such cases it becomes important to inquire, what was the situation of the ship, and what were the indications on the part of the crew If the captain saw his men hastening to the assistance of his officers, and manifesting a disposition to reduce the mutinous person to obedience, it would be a circumstance to show, that the use of a deadly weapon might not be required. If the crew left their stations, without openly manifesting such a disposition, even though they made no attempt to assist or encourage the mutinous person, still the captain might honestly regard that as a suspicious circumstance; because a seaman, in time of difficulty between the officers and any of the men, ought not to leave his station unbidden, unless he intends to render active assistance to the officers. In the case at bar, several of the men left their stations, and hurried towards the scene. And though they might have done so from honest motives, still the captain, at that moment, had the right to judge, from appearances, whether or not they came with hostile designs. A very important circumstance was, that the man at the wheel left his station, and the ship caught aback, and lay at the mercy of the waves. One other man, also, openly encouraged the mutineer, who was resisting the authority of the officers, armed with a dangerous weapon. There was some evidence tending to show, that at the commencement of the matter, an order had been given to seize Fuller up, and that it was in resistance of this order that he seized the axe, to prevent its execution. It is well known that this order precedes, and is usually preparatory to, the infliction of corporal punishment. Still it is not always inflicted, although the man is actually made fast to the rigging. Often he is released upon his promise of obedience, after he has been admonished by the seizing up, that he is in the power of the officers. This order, therefore, would not justify Fuller in using a dangerous weapon.

If the jury, then, believe that Fuller was brandishing a deadly weapon, and threatening the officers with it, and that there were

indications that others of the crew were about to co-operate with him, and that all the circumstances were such as to induce a captain of ordinary firmness and discretion, to believe that the use of a pistol was necessary to suppress a mutiny, and that the captain in this instance did so believe, then the defendant at the bar would be justified; but, if no such necessity, or apparent necessity, existed, then he would not be justified.

The jury returned a verdict of not guilty.

[For a libel by Fuller against the master on account of the same assault, see Case No. 5,149.] See Roberts v. Eldridge [Case No. 11,901]; U. S. v. Lunt [Id. 15,643]; and U. S. v. Borden [Id. 14,625].